# In the United States Court of Federal Claims

No. 23-427
(Filed:  15 May 2024)

```
*****************************************
BYRON J. BENITEZ,                        *
                                         *
                    Plaintiff,           *
                                         *
v.                                       *
                                         *
THE UNITED STATES,                       *
                                         *
                    Defendant.           *
                                         *
*****************************************
```

*Elisabeth L. Sherwood* and *Nicholas D. Stellakis*, Hunton Andrews Kurth LLP, of Boston, MA, with whom were *Esther Leibrarth*, *Rochelle Bobroff*, and *Matthew Handley*, National Veterans Legal Services Program, of Arlington, VA, for plaintiff.

*Douglas G. Edelschick*, Senior Trial Counsel, *L. Misha Preheim*, Assistant Director, *Patricia M. McCarthy*, Director, Commercial Litigation Branch, and *Brian M. Boynton*, Principal Deputy Assistant Attorney General, Civil Division, U.S. Department of Justice, of Washington, DC, with whom was *Holly Bryant*, Litigation Attorney, Military Personnel Branch, U.S. Army Legal Services Agency, of Fort Belvoir, VA, for defendant.

## OPINION AND ORDER

Plaintiff Byron Benitez served the United States in the Army from September 2002 until he was administratively separated in January 2006.  During his service, Mr. Benitez won awards for his heroic service in Operation Iraqi Freedom.  As a result of his wartime experiences, however, Mr. Benitez struggled with mental health issues and, while on active duty in 2005, attempted to overdose on prescription ibuprofen.  Plaintiff was hospitalized, and the Army subsequently diagnosed Mr. Benitez with a myriad of disorders, including adjustment disorder, post-traumatic stress disorder, major depressive disorder, and personality disorder.  Due to his post-traumatic stress disorder with major depressive disorder, the Army could have started the process for discharging Mr. Benitez with medical retirement.  *See infra* Section I.C.  Despite these diagnoses, however, the Army began administrative separation procedures—a more expeditious process for less serious medical conditions—citing his diagnosed adjustment disorder.  *See infra* note 9.  Less than two weeks after his discharge, Mr. Benitez sought care from a Veterans Affairs clinic, where he was again diagnosed with post-traumatic stress disorder.  Since visiting the clinic, Mr. Benitez has received veterans benefits due to his post-discharge diagnosis, yet because he was administratively separated rather than medically retired, he was never awarded medical retirement benefits.  In 2021, Mr. Benitez filed an application with the Army Board of Corrections for Military Records asking the Board to correct his reason for

discharge, arguing he should have been medically retired for post-traumatic stress disorder rather than administratively separated for adjustment disorder.  The Board denied Mr. Benitez's application, finding no error in the Army's administrative separation.  Mr. Benitez appealed the Board's decision to this court, and the government filed a motion to dismiss pursuant to RCFC 12(b)(1).  The government argues Mr. Benitez's claim falls outside the statute of limitations, contending Mr. Benitez knew of his compensable condition at the time of discharge.  For the foregoing reasons, the Court denies the government's Motion to Dismiss.

I.     Background

   A.     Factual History

The Court draws the following undisputed facts from plaintiff's Complaint and the Administrative Record.  Plaintiff served in the Army from September 2002 to January 2006.  *See* Compl. at 8, ECF No. 1; Pl.'s Opp'n Def.'s Mot. to Dismiss Compl. ("Pl.'s Resp.") at 3, 8, ECF No. 9 (citing Administrative Record (AR) at 61, ECF No. 6).  He deployed to Iraq in 2003, taking part in operation Iraqi Freedom.  *Id.* at 4.  Mr. Benitez engaged in at least two active enemy attacks, witnessed two roadside bomb explosions, and was awarded an Army Commendation Medal and Combat Action Badge for his service.  *See id*. (citing AR at 9, 22, 61).  After returning from deployment, Mr. Benitez's mental health continually worsened.  Tr. at 79:11–18 ("THE COURT:  When do you allege that the PTSD developed?  [PLAINTIFF:] . . . He first began showing symptoms in about April of 2004, and it worsened over time . . . .").  Following a suicide attempt in October 2005, Army medical providers diagnosed him with "adjustment disorder," and over the next month subsequent providers diagnosed him with chronic post-traumatic stress disorder (PTSD) and major depressive disorder (MDD).  Pl.'s Resp. at 5–6 (citing AR at 141, 154).  The Army then began separation proceedings under Mr. Benitez's diagnosis for "adjustment disorder" and discharged him on 27 January 2006 for a mental health condition that was not a disability.  Def.'s Mot. Dismiss ("Gov't's MTD") at 3, ECF No. 7 (citing AR at 303, 306–08, 316).  Following discharge, on 7 February 2006, Mr. Benitez sought treatment at a Department of Veteran's affairs (VA) clinic, which diagnosed him with PTSD and MDD.  *Id.* at 3–4 (citing AR at 464–82).  In October 2006, the VA granted him a disability rating of 30 percent for these same conditions, which was increased to 50 percent, 70 percent, and 100 percent at various later evaluations.  *Id.* at 4 (citing AR at 29, 416–18).  In January 2021, Mr. Benitez sought correction of his military records from the Army Board for Correction of Military Records (ABCMR or "the Board"), which in September 2022 denied his requests to change his military records to a medical retirement for PTSD and MDD.  *Id.* (citing AR at 1–56).

   B.     Procedural History

Plaintiff filed a complaint on 28 March 2023 seeking to change the reasons for his separation from the Army.  *See* Compl. at 35.  Mr. Benitez argues he was improperly discharged for an adjustment disorder when he should have been medically retired for PTSD and/or MDD and given a disability rating and disability benefits.  *See id*. at 33–34.  Mr. Benitez alleges because he was not provided medical retirement, he "continues to be deprived of the disability retirement pay and benefits to which he is entitled under 10 U.S.C. § 1201."  *Id.* at 35.  On 12

June 2023, the government filed a motion to dismiss pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"). Gov't's MTD at 1. Plaintiff filed a response on 7 August 2023, Pl.'s Resp. at 1, and the government filed a reply on 17 August 2023, Def.'s Reply in Supp. of Mot. to Dismiss ("Gov't's Reply") at 1, ECF No. 10. The Court held oral argument on 25 January 2024. *See* Order, ECF No. 11.

### C. Administrative Separation and Disability Retirement

At the time of plaintiff's separation from the military, Army statutes and regulations provided two categories of disabilities for discharge: "unfitting" conditions and non-compensable conditions. For the first, unfitting conditions, upon determining a member of the military "is unfit to perform [his or her] duties . . . because of a physical disability," the "Secretary may retire the member, with retired pay . . . if the Secretary also makes the determinations with respect to the member and that disability specified [under the statute]." 10 U.S.C. § 1201(a) (2005); *see also* Compl. at 9–10. Department of Defense (DOD) implemented this congressional directive by establishing the Disability Evaluation System (DES), now the Integrated Disability Evaluation System (IDES). *See Integrated Disability Evaluation System*, HEALTH.MIL (July 11, 2023). The DOD issued a directive, 1332.18, which "sets forth policies, responsibilities and procedures that apply in determining whether a soldier is unfit because of a physical disability to reasonably perform [his or her] duties" via the DES. Army Reg. 635-40, § 1-1 (1990). DOD directives indicate "[n]ormally, soldiers who are not likely to return to duty will be processed as soon as this probability is ascertained." Army Reg. 635-40, § 3-14 (1990). The DOD "ordinarily processes medical disability retirements of active service members through the [DES]." *O'Hare v. United States*, 155 Fed. Cl. 364, 369 (2021). "[T]he first step of the DES is referral to a medical evaluation board ('MEB'). . . . That is followed, if necessary, by referral to a physical evaluation board ('PEB')." *Id.* at 370 (citations omitted). Upon determining an individual has a non-compensable condition not amounting to a disability under Army Regulation 635-40, however, the military "may approve separation . . . on the basis of other physical or mental conditions not amounting to disability." Army Reg. 635-200, § 5-17 (2005). Army regulations provide examples of these conditions as, *inter alia*, "disorders manifesting disturbances of perception, thinking, emotional control or behavior sufficiently severe that the soldier's ability to effectively perform military duties is significantly impaired." *Id.* § 5-17(8). Plaintiff contends in his Complaint "PTSD and MDD, when incurred or aggravated in the line of duty are considered compensable conditions, . . . [while] adjustment disorder and personality disorder [are not]." Compl. at 9–10.[1] The government acknowledged at oral argument administrative separation is a "much quicker" process than a medical discharge. Tr. at 56:25–57:6 ("[THE COURT:] [Y]ou agree, an administrative separation rather than a medical discharge is much simpler and faster? [GOVERNMENT]: Yes, indeed, much quicker, and I'm sure that's what the military had in mind when they did it . . . ."); *see also infra* note 9.

---

[1] Plaintiff does not cite a statute or Army Regulation for this proposition. *See* Compl. at 9–10. The government, however, does not contest plaintiff's assertion. *See* Gov't's MTD. Although not briefed by the parties, the Court notes Army Regulation 635-40, § B-107(h) states: "Certain mental disorders render a soldier administratively unfit rather than unfit because of physical disability." Army Reg. 635-40, § B-107(h) (1990); *see also id.* § 3-1 ("In each case, it is necessary to compare the nature and degree of physical disability present with the requirements of the duties the soldier reasonably may be expected to perform because of his or her office, grade, rank, or rating."); Army Reg. 635-200, § 5-17 (2005) (noting the military "may approve separation . . . on the basis of other physical or mental conditions not amounting to disability").

**II.     Parties' Arguments**

The government seeks to dismiss the case "for lack of jurisdiction on statute of limitations grounds." Gov't's MTD at 1. The government acknowledges "the *general rule* is that[] 'if the service member had neither requested nor been offered consideration by a [PEB] disability board prior to discharge, the later denial of his petition by a corrections board, not his discharge, triggers the statute of limitations.'" *Id.* at 6–7 (quoting *Chambers v. United States*, 417 F.3d 1218, 1226 (Fed. Cir. 2005). Under the exception to the general rule, however, established in *Real v. United States*, 906 F.2d 1557 (Fed. Cir. 1990) (the "*Real* exception"), a "'service member's failure to request review of his case by the appropriate PEB prior to discharge . . . can invoke the statute of limitations when the service member has sufficient actual or constructive notice of his disability, and hence of his entitlement to disability retirement pay, at the time of his discharge.'" *Id.* at 7 (quoting *Chambers*, 417 F.3d at 1226). The government argues the exception applies because Mr. Benitez had already been diagnosed with PTSD and MDD before his discharge, knew he was experiencing symptoms of PTSD and MDD, and that his knowledge of his PTSD is confirmed by seeking treatment at the VA clinic only 11 days after his discharge. Gov't's MTD at 8–10. The government concludes "Mr. Benitez filed this lawsuit 11 years too late . . . ." *Id.* at 10.

Plaintiff responds the exception to the general rule does not apply to Mr. Benitez's case. Pl.'s Resp. at 1. Plaintiff asserts the *Real* exception "applies only where the service member actually *knew* at the time of discharge that he or she: (1) had a *permanent* unfitting disability not due to his or her misconduct; (2) was entitled to be referred to a Physical Evaluation Board ("PEB") for a determination of rights before discharge; *and* (3) was waiving his or her right to be evaluated by a PEB." *Id.* (citing *Real*, 906 F.2d 1557). First, plaintiff argues Mr. Benitez was given multiple conflicting diagnosis for adjustment disorder, PTSD, MDD, and personality disorder. *Id.* at 12 (citing AR at 151, 154–158, 162–169, 304, 512, 515, 518). Plaintiff asserts he had no knowledge of his PTSD with MDD diagnosis until after he was discharged from the Army and the VA began treating him and, therefore, he did not have actual knowledge of his compensable disabilities at the time of his discharge. *See id.* Second, plaintiff argues he did not know his disabilities were of a permanent nature because the Army discharged him only for his diagnosis of adjustment disorder, which is not a permanent diagnosis. *Id.* at 12–14. Third, plaintiff argues Mr. Benitez did not know he had a right to be evaluated by a PEB because "the Army told him . . . that any and all forms of administrative review were 'not applicable' to him." *Id.* at 15 (citing AR at 171–72, 308–10). Fourth, plaintiff alleges the *Real* exception does not apply because his condition was transient, as evidenced by his attempt at reenlistment, which would render the *Real* exception inapplicable. *See id.* at 13. Finally, plaintiff alleges he incorrectly believed his mental health condition was the result of his own misconduct—i.e., the health condition stemmed from his impermissible overdose on prescription drugs. *Id.* at 14.

The government charges plaintiff with "squeez[ing] the *Real* exception out of existence," and instead contends, under the *Real* exception, plaintiff's sufficient actual or constructive notice of his disability alone begins the statute of limitations. Gov't's Reply at 1–2 (citing *Chambers*, 417 F.3d at 1226). The government alleges Mr. Benitez both knew of his qualifying condition at the time of his discharge and was not required to be informed of his right to DES review. *Id.* at

2–3.  According to the government, Mr. Benitez's knowledge of his PTSD was sufficient to put him on notice of his right to disability retirement due to a permanent condition.  *Id.* at 5–6.

### III. Applicable Legal Standards

"Subject matter jurisdiction is a threshold issue that must be determined at the outset of a case."  *King v. United States*, 81 Fed. Cl. 766, 768 (2008) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998)).  When deciding a motion to dismiss for lack of subject matter jurisdiction, the court must assume the allegations in the complaint are true and "draw all reasonable inferences in plaintiff's favor."  *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995).  Nevertheless, plaintiff still bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence.  *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988) (citing *Zunamon v. Brown*, 418 F.2d 883, 886 (8th Cir. 1969) (additional citations omitted)).  For a motion to dismiss pursuant to RCFC 12(b)(1) where a party "denies or controverts the pleader's allegations of jurisdiction . . . only uncontroverted factual allegations are accepted as true for purposes of the motion."  *Cedars Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583–84 (Fed. Cir. 1993) (first citing *Trentacosta v. Frontier Pac. Aircraft Indus., Inc.*, 813 F.2d 1553, 1558–59 (9th Cir. 1987); then citing 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1363, at 456–57 (1990); then citing *Gibbs v. Buck*, 307 U.S. 66, 72 (1939); and then citing 5A WRIGHT & MILLER, *supra* §§ 1350, 1363, at 219–20, 457).  Any other facts "underlying the controverted jurisdictional allegations are in dispute and are subject to fact-finding by the district court."  *Id.* at 1584 (citation omitted).  If a motion to dismiss under RCFC 12(b)(1) challenges jurisdictional facts alleged in the complaint, "the . . . court may consider relevant evidence to resolve the factual dispute."  *Reynolds*, 846 F.2d at 747 (citations omitted).

### IV. Whether Plaintiff's Claim Accrued at the Time of Discharge

The government alleges plaintiff's knowledge of his PTSD at the time of discharge bars his claim under the statute of limitations.  *See* Gov't's MTD at 7–8.  Plaintiff disagrees, contending both:  (1) Mr. Benitez did not know he had PTSD; and (2) even if Mr. Benitez did have knowledge of his PTSD, he did not have knowledge of his right to demand a disability board review prior to his discharge.  Pl.'s Resp. at 11–16.  Under the general rule, a cause of action for disability retirement benefits does not accrue "until the appropriate military board either finally denies such a claim or refuses to hear it."  *Chambers v. United States*, 417 F.3d 1218, 1224 (Fed. Cir. 2005) (citing *Real v. United States*, 906 F.2d 1557, 1560 (Fed. Cir. 1990) (additional citation omitted)).  An exception exists to this general rule, however, when "at the time of his separation . . . [a veteran] knew that he was entitled to disability retirement due to a permanent disability that was not a result of his intentional misconduct and was service-connected."  *Id.* at 1226.  If a veteran has knowledge sufficient to meet this "*Real* exception," his claim accrues at the time of discharge, rather than after a board denies his claim.  *Id.* at 1224.  Both parties agree *Chambers* is the controlling precedent for the *Real* exception.  Tr. at 15:18–21 ("[THE COURT:]  [Y]ou agree that *Chambers* is the standard that we're working with?  It's the most recent published decision from the Circuit?  [PLAINTIFF]:  Yes, Your Honor.") (emphasis added); Tr. at 21:10–11 ("[GOVERNMENT:]  *Chambers* is the standard.") (emphasis added).  The parties, however, disagree whether the "knowledge" requirement from *Real* requires only

knowledge of a *qualifying permanent disability* or also requires knowledge of a *right to disability retirement*.  The Court accordingly first turns to the appropriate legal standard before applying the standard to Mr. Benitez's case.

### A.   Whether the *Real* Exception Requires Knowledge of Both a Qualifying Injury and Entitlement to Disability Retirement

The parties disagree whether a veteran's knowledge of his condition alone is sufficient to meet the *Real* exception.  Plaintiff contends the *Real* exception is a two-part test, requiring a veteran to not only know of his condition but also of his right to challenge his entitlement to benefits.  Tr. at 17:4–18:3 ("[PLAINTIFF:]  [*Chambers* is] referring to actual or constructive notice of entitlement to disability retirement pay, which is to say not a disability, but all of these other factors as laid out in *Real* that would entitle a person to be referred into the [DES].").  The government alleges a veteran's knowledge of his qualifying injury alone is sufficient to begin the statute of limitations.  *See* Tr. at 25:2–23 ("I mean, [knowledge of DES Processing is] really what *Chambers* did away with.").  In *Chambers*, the Federal Circuit indicated the appropriate inquiry is "whether at the time of [a veteran's] separation from the Army . . . [the veteran] knew that he was entitled to disability retirement due to a permanent disability that was not a result of his intentional misconduct and was service-connected."  *Chambers*, 417 F.3d at 1226.  The Circuit did not indicate when (or whether) knowledge of "entitle[ment] to disability retirement" could stem from the injury alone.  *See id.*  In *Pohl v. United States*, an unpublished 2013 opinion, the Circuit addressed this lack of clarity in the caselaw.  *Pohl v. United States*, 2023 WL 2982476, at *4 (Fed. Cir. 2023) (unpublished opinion).  There, the Federal Circuit stated "applicable case law is not clear whether the exception requires satisfaction of:  (1) an awareness of the condition, and (2) an awareness that the failure to demand a board review before discharge will result in potentially losing disability benefits."  *Id.*

The Federal Circuit noted in *Pohl* the best evidence for a two-prong approach stems from *Real* itself.  *Id.* (citing *Real*, 906 F.2d at 1562 n.6).  In *Real*, the Circuit stated:  "Whether [the] veteran's knowledge of the existence and extent of his condition at the time of his discharge was sufficient to justify concluding that he waived the right to board review of the service's finding of fitness by failing to demand a board prior to his discharge must be determined by reference to the statutory requirements for entitlement to such benefits."  *Real*, 906 F.2d at 1562.  In footnote six, the panel qualified this holding:  "This assumes that the service member has been informed that the failure to demand a board prior to discharge will result in his being ineligible for disability benefits from the service."  *Id.* at 1562 n.6.  This footnote implies a veteran lacking knowledge of his ability to challenge his reason for discharge would not satisfy the *Real* exception.  *See id.*  As the Circuit noted in *Pohl*, subsequent Federal Circuit precedent cases have not cited this footnote and are inconsistent in treating the test as two-pronged or one-pronged. *Pohl*, 2023 WL 2982476, at *4 (first citing *Purvis v. United States*, 77 F. App'x 512, 514 (Fed. Cir. 2023) (treating the *Real* exception as two-pronged); then citing *Ullmann v. United States*, 123 F. App'x 970, 973 (Fed. Cir. 2004) (discussing the *Real* exception under only one prong); and then citing *Chambers*, 417 F.3d at 1226 (discussing the *Real* exception without mentioning footnote six)).

Although cases since *Real* have not always cited its footnote six, cases preceding *Real* were largely consistent with a two-pronged approach. For example, in *Friedman*, the Court of Claims indicated the statute of limitation does not begin for veterans who did not request board review prior to discharge:

> As for those claimants who did not have (or request) a Retiring Board (probably because they had no adequate idea they were or could be disabled) and who thereafter apply to the Correction Board, their single judicial cause of action does not accrue, under the court's decisions, until completion of the Correction Board proceedings . . . .

*Friedman v. United States*, 310 F.2d 381, 398 n.23 (Ct. Cl. 1963). This passage was cited again in *Fuller*, where the Claims Court indicated the *Friedman* "*dicta*" did not apply "in a case where the claimant, with full knowledge of his *disability and his rights*, waives his right to a hearing." *Fuller v. United States*, 14 Cl. Ct. 542, 544 (1988) (emphasis added). The Claims Court accordingly acknowledged the two-pronged *Friedman* rule requiring knowledge of both *disability* and *rights* while noting the ability of a veteran to waive his rights to a board hearing. *Id.*

In *Chambers*, however—a post-*Real* case—the Federal Circuit cited *Friedman* but did not address the case's two-pronged approach directly. The panel characterized the "general rule" of *Friedman* as: "[I]f the service member had neither requested nor been offered consideration by a disability board prior to discharge, the later denial of his petition by a corrections board, not his discharge, triggers the statute of limitations." *Chambers*, 417 F.3d at 1226. Even when a veteran fails to request a hearing, however, the panel noted the statute of limitations can be invoked "when the service member has *sufficient* actual or constructive notice of his disability, *and hence*, of his entitlement to disability retirement pay." *Id.* (emphases added) (citing *Friedman*, 906 F.2d at 1562). Though citing *Friedman* for this point, the panel did not clarify whether a veteran's "sufficient knowledge" of his injury necessarily puts him on constructive notice of his right to disability retirement pay or whether a veteran may be fully aware of his injury but nevertheless reasonably unaware of his entitlement to retirement pay. The former would require only knowledge of the injury alone, while the latter would permit those reasonably unaware of the disability retirement process to bring a claim after discharge. As the court indicated in *Pohl*, therefore, it is "not clear" whether the *Real* exception is a one-prong or two-prong inquiry. *Pohl*, 2023 WL 2982476, at *4.

Current caselaw does not clarify whether the *Real* exception is two-pronged or not. If the rule from *Friedman* survived *Chambers*, the *Real* inquiry is likely two-pronged, *see supra*. Even if the test is appropriately single-pronged, however, plaintiff can avoid the *Real* exception by establishing a lack of knowledge under both prongs by a preponderance of the evidence. The Court accordingly turns to each prong to determine whether plaintiff has established his lack of knowledge of both his *disability* and his *right* to review by a board.[2]

---

[2] Plaintiff alleges the Court should apply "liberal consideration" in this case due to the nature of plaintiff's PTSD diagnosis and the Federal Circuit's decision in *Doyon v. United States*, 58 F.4th 1235 (Fed. Cir. 2023). Tr. at 27:8–12 ("Mental conditions now statutorily require the application of liberal consideration, particularly when PTSD is involved, as it is here, and this is not the same consideration now, post-*Doyon*, that is applicable to physical

### B. Whether Mr. Benitez Had Sufficient Actual or Constructive Notice of His Injury

Plaintiff contends he "did not know his accurate diagnoses" and therefore the statute of limitations did not begin on his claim until after the ABCMR denied his application. Pl.'s Resp. at 11 (cleaned up). According to plaintiff, he "was given numerous conflicting diagnoses, including adjustment disorder, PTSD, MDD, and personality disorder," and because the Army discharged him for adjustment disorder, "there is no basis in the record for the Army's assertion that Benitez knew he had a compensable mental-health condition." *Id.* at 12. The government argues plaintiff's "in-service diagnosis and drug treatment" and his "treatment by the VA almost immediately after his discharge" contradict the allegation he lacked knowledge. Gov't's Reply at 3. At the time of discharge, the government argues Mr. Benitez "was experiencing symptoms of chronic PTSD and MDD . . . [and] began drug treatments on October 27, 2005, immediately upon receipt of his PTSD and MDD diagnoses." *Id.* at 4 (first citing AR at 62–63; 397–98; and then citing AR at 340, 356, 735, 746). Plaintiff acknowledged at oral argument "knowledge of a service-connected PTSD condition would put someone on notice of entitlement to disability pay . . . if [the disability] was also known to be permanent and not a result of misconduct." Tr. at 16:22–17:2. Whether this record supports a finding plaintiff did not have sufficient actual or constructive knowledge of his injury is an inquiry which plaintiff must establish under a preponderance of the evidence. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988) (citing *Zunamon v. Brown*, 418 F.2d 883, 886 (8th Cir. 1969)). To succeed in alleging a lack of knowledge, plaintiff must "establish[] by a preponderance of the evidence," *Reynolds*, 846 F.2d at 748, the allegedly "conflicting diagnoses," Pl.'s Resp. at 12, prevented Mr. Benitez from having "sufficient actual or constructive knowledge" of his injury, *Chambers*, 417 F.3d at 1226. The Court turns to the administrative record to determine whether plaintiff's arguments are supported by a preponderance of the evidence.

---

conditions."). The liberal consideration standard was initially implemented through various Department of Defense memos and later codified at 10 U.S.C. § 1552(h). *See* Tr. at 27:25–28:20; *Doyon*, 58 F.4th at 1238. Subsection (h), like the earlier memos, requires reviewing boards to have a "more lenient liberal consideration evidentiary standard" for PTSD-related claims because "it is unreasonable to expect the same level of proof for injustices committed years ago when PTSD was far less understood than it is today." *Doyon*, 58 F.4th at 1238 (cleaned up). This provision, however, only applies to "a board established [by the Secretary of a military department]." 10 U.S.C. § 1552(h) (2024). In a PTSD-related claim, therefore, the reviewing board's task is to liberally consider, in light of plaintiff's submitted evidence, whether PTSD diagnosed post-service could have existed at the time of discharge and potentially contributed to separation. *See Doyon*, 58 F.4th at 1244. Whether the ABCMR reviewed plaintiff's claim with liberal consideration in this case is a question for motion for judgment on the administrative record, not a motion to dismiss for lack of subject matter jurisdiction. *Id.* at 1242. At this stage, the Court assesses—separate from the ABCMR's decision—only whether plaintiff had actual or constructive knowledge of his injuries to trigger the statute of limitations on his claim. *See Chambers*, 417 F.3d at 1226. Plaintiff has not provided a Federal Circuit or Court of Federal Claims case employing the *Doyon* standard in a motion to dismiss for lack of subject matter jurisdiction. Furthermore, the Court notes the *Doyon* standard, to the extent it applies at the merits stage, is separate from the "veterans canon," a substantive canon of statutory interpretation where "statutes that provide benefits to veterans are to be construed 'in the veteran's favor.'" *Rudisill v. McDonough*, 144 S. Ct. 945, 959 (2024) (Kavanaugh, J., concurring) (quoting *Brown v. Gardner*, 514 U.S. 115, 118 (1994)). In a recent concurrence, Justice Kavanaugh doubted the canon's constitutional grounding, noting "[t]he Judiciary's role is to neutrally interpret those statutes, not to put a thumb on the scale in favor of or against any particular group." *Id.* at 961. In this case, the statute potentially applicable at the merits stage in this case explicitly requires "liberal consideration" and thus does not implicate the veterans canon. 10 U.S.C. § 1552(h) (2024).

First, the Court determines whether plaintiff had "conflicting diagnoses" supporting his lack of knowledge. Pl.'s Resp. at 12. While plaintiff's medical records include references to PTSD and MDD, neither of these conditions were diagnosed until after his suicide attempt and after he was diagnosed with other mental health disorders. Mr. Benitez was hospitalized for overdose of ibuprofen and naproxen on 11 October 2005. AR at 407 (Medical Record – Patient Release/Discharge Instructions). Plaintiff's discharge form, dated 13 October 2005, indicates he was diagnosed with adjustment disorder and occupational stress. *Id.* On 20 October 2005, plaintiff met with a counseling psychologist and clinical/forensic psychologist. AR at 143–47. Plaintiff's records from this counseling visit do not indicate any PTSD or MDD diagnosis. *See id.* The first time "PTSD" appears (chronologically) in plaintiff's medical history is in documentation for a psychiatric assessment dated 25 October 2005, wherein a second psychologist diagnosed Mr. Benitez with occupational stressors and "PTSD (chronic)." AR at 141 (25 October 2005 Chronological Record of Medical Care). Records from a follow-up appointment on 27 October 2005 add an additional diagnosis for MDD. AR at 154 (27 October 2005 Miscellaneous Medical Report). Between these two appointments, however, plaintiff returned to his first psychiatrist on 26 October 2005 for a mental status evaluation. Though referencing plaintiff's "problems with adjustment," the first psychiatrist did not mention PTSD or MDD. AR at 151 (26 October 2005 Mental Status Evaluation). The military conducted additional mental health evaluations on 27 December 2005 and 3 January 2006. The 27 December 2005 evaluation found plaintiff had an adjustment disorder and depression, while the 3 January 2006 evaluation found plaintiff had a personality disorder. AR at 174 (27 December 2005 Mental Status Evaluation); AR at 178 (3 January 2006 Mental Status Evaluation). Neither of these evaluations reference PTSD or MDD. While these various diagnoses may be confusing to a patient, they are not necessarily incompatible. At oral argument, plaintiff conceded "it is not the case that adjustment disorder and PTSD are in all cases incompatible." Tr. at 38:21–23. Although plaintiff contends his adjustment disorder was incorrect, this does not mean Mr. Benitez's non-compensable diagnosis is necessarily incompatible with the unfitting diagnosis. Tr. at 39:11–16 ("[THE COURT:] [D]id he have an adjustment disorder? [PLAINTIFF]: No, Your Honor. THE COURT: . . . That was a bad diagnosis? [PLAINTFF]: Yes, Your Honor."). As plaintiff admits the diagnoses are not incompatible, the incompatibility of plaintiff's diagnoses alone cannot establish plaintiff's lack of knowledge. Notably, plaintiff may have been confused by or unaware of his diagnoses. No evidence in the record, however, indicates plaintiff was unaware of his condition due to the incompatibility of his diagnoses alone. *See Chambers*, 417 F.3d at 1226.

The government argues it is reasonable to assume plaintiff's medical providers described plaintiff's PTSD with MDD, as it is "hard to believe" plaintiff's doctors were "in the habit of hiding from the patient the diagnosis for which they are prescribing drug treatment." Tr. at 47:24–48:1. At oral argument, the government stated: "[W]hat did he think was happening? I mean you have to make . . . an assumption." Tr. at 47:4–6. The government's argument relies only on a "presumption of regularity" plaintiff's doctors informed Mr. Benitez of his diagnoses. Tr. at 48:1–2. Plaintiff contends he was not aware of his PTSD and MDD diagnoses, despite the diagnoses appearing in his medical records. Tr. at 40:1–9 ("THE COURT: Mr. Benitez's PTSD diagnosis was on each of his medical reports up to his separation. He would have seen these reports, correct? [PLAINTIFF]: No, Your Honor. He did not see these reports until he

requested them . . . in 20[2]2."). Each of plaintiff's medical records generated after 27 October 2005 include a running list various "Problems" suffered by Mr. Benitez. *See, e.g.*, AR at 735 (8 December 2005 Chronological Record of Medical Care); AR at 356 (12 December 2005 Chronological Record of Medical Care); AR at 340 (17 January 2006 Chronological Record of Medical Care). For example, plaintiff's 8 December 2005 and 12 December 2005 records both list "adjustment disorder with depressed mood," "chronic post-traumatic stress disorder," and "adjustment disorder." AR at 735 (8 December 2005 Chronological Record of Medical Care); AR at 356 (12 December 2005 Chronological Record of Medical Care); *see also* AR at 692 (24 October 2005 Health Record) (listing only "Occupational Problem" and "Adjustment Disorder"). Plaintiff's 17 January 2006 record—notably generated after plaintiff's mental status evaluation—additionally lists "major depression, recurrent" and "personality disorder." AR at 340 (17 January 2006 Chronological Record of Medical Care). Plaintiff alleges he did not receive these files until he requested the records through counsel well after his discharge. Tr. at 40:4–7 ("He did not see these reports until he requested them . . . in 20[2]2."); Compl. at 5 ("In 2021, after discovering these errors, Benitez asked the [ABCMR] to correct his record . . . ."); *id.* at 7 n.4 ("Benitez filed within months of discovering his improper diagnoses."). As the government does not contest the fact plaintiff did not receive these medical records until after his discharge, the Court must accept the allegation as true; the medical records themselves therefore cannot undermine plaintiff's lack of sufficient knowledge on their own. *See Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1584 (Fed. Cir. 1993) ("[U]ncontroverted factual allegations are accepted as true for purposes of [a] motion [to dismiss for lack of jurisdiction]." (citations omitted)). The government's arguments, therefore, rely on an assumption plaintiff was sufficiently informed of his PTSD and MDD diagnoses in his medical records. The Court addresses assumptions from the records in concert *infra*. Preliminarily, however, plaintiff's counsel submitted at oral argument: "[Plaintiff] knew that he was having mental health problems. He didn't know what the origin was." Tr. at 97:21–22. Even if plaintiff was told of his PTSD diagnosis, the Court would also have to assume plaintiff knew (or was informed of) the difference between PTSD and adjustment disorder. Particularly in light of the VA's later determination plaintiff needed "psychoeducation," *see infra*, there is no indication in the record plaintiff's single diagnosis of PTSD on 25 October 2005 was properly explained by his providers and he was therefore aware of his compensable condition. Such an inference cannot outweigh the evidence in the record showing plaintiff was diagnosed with multiple different conditions in the same month, was discharged for adjustment disorder, and was later found to need "psychoeducation." The evidence in the record of plaintiff's medical diagnoses accordingly indicate plaintiff, under a preponderance standard, was unaware of his PTSD with MDD. *See Reynolds*, 846 F.2d at 748; *Chambers*, 417 F.3d at 1226.

Second, the government contends plaintiff's drug prescriptions while in service support plaintiff's knowledge of his PTSD with MDD, as plaintiff's medical providers would not have prescribed without first informing Mr. Benitez of his diagnoses. *See* Gov't's Reply at 4–5. Plaintiff's medical records show plaintiff was prescribed fluoxetine HCL (Prozac) and quetiapine fumarate, both of which were filled on 27 October 2005 and refilled on 5 January 2006. AR at 735 (8 December 2005 Chronological Record of Medical Care); AR at 340 (17 January 2006 Chronological Record of Medical Care). Plaintiff indicated at oral argument, "[Prozac is] very commonly prescribed to a ton of people, frankly, with any kind of depressive symptoms, [and] I would have to verify Mr. Benitez understood that the quetiapine was essentially a sleeping

pill . . . because he was having difficulty with that." Tr. at 96:23–97:8. Although plaintiff did not cite any support for fluoxetine's treatment for more than PTSD with MDD, the government did not contest this fact; and the Court further takes judicial notice of the drug's common prescription for other, non-compensable conditions less severe than PTSD. *See Fluoxetine*, MEDLINE PLUS, NAT'L INSTS. HEALTH NAT'L LIB. MED. (Jan. 15, 2022), https://medlineplus.gov/druginfo/meds/a689006.html ("Fluoxetine is used to treat depression, obsessive-compulsive disorder . . . , some eating disorders, and panic attacks."). The government again relies on the presumption of regularity, arguing "[under] the presumption of regularity, you have to assume when he was diagnosed with those conditions, the medical provider in the ordinary course would explain to him . . . what their diagnosis is and why they're treating him with drugs, heavy drugs." Tr. at 52:5–10. The government admits, however, there is nothing in the record "that says 'I told Mr. Benitez you have this condition.'" Tr. at 48:4–6. The government's contention rests on "an assumption":

> [GOVERNMENT:]  Mr. Benitez was in the room when the [PTSD] diagnosis was made . . . .
>
> THE COURT:  Do we have evidence of that?
>
> [GOVERNMENT]:  [Plaintiff's psychiatrist] is interviewing Mr. Benitez.  In her evaluation she's writing down all of his symptoms and everything he's going through. . . .
>
> [THE COURT:]  [D]octors can make a reference that says 'advised patient of PTSD diagnosis,' and that's not in the record.
>
> [GOVERNMENT]:  I don't think there's a statement to that effect . . . . [Y]ou have to make an assumption.

Tr. at 46:11–47:6. As evidence contrary to the government's assumption, plaintiff cites Mr. Benitez's declaration signed 5 January 2021 which states, "I had mental health outpatient appointments and was prescribed medication, including Prozac, for depression and difficulty sleeping." AR at 63 (1 January 2021 Decl. of Byron J. Benitez). Notably, the declaration indicates Mr. Benitez was aware he was taking these drugs for "depression" and "difficulty sleeping" rather than PTSD with MDD. *See id.* Plaintiff's declaration aligns with a note in plaintiff's medical records on 7 December 2005 stating "[p]atient reports dizziness is a side effect of the meds he is currently taking for *depression*." AR at 746 (7 December 2005 Chronological Record of Medical Care) (emphasis added). As the prescribed medications can treat multiple conditions, the affirmative prescription-based evidence the government cites is therefore the timing of plaintiff's prescriptions, which were filled on 27 October 2005. AR at 735. The government does not cite any additional support in the record,[3] and the Court is

---

[3] The parties did not discuss a form indicating "Medical Record Patient Release/Discharge Instructions," signed on 25 October 2005. AR at 391. The form is practically illegible, though it contains sections labeled "Final Diagnosis and Condition at Discharge," "Medications," "Patient Education" and "Medications," where one of the questions under "Medications" is whether "[p]atient verbalizes understanding of prescribed medications." *Id.* Due to the

accordingly required to weigh this prescription timing against three other factors supporting plaintiff's position: (1) plaintiff's declaration he was prescribed "medication, including Prozac for depression and difficulty sleeping," AR at 63; (2) multiple diagnoses around the same time diagnosing him with an adjustment disorder and a personality disorder, AR at 407 (13 October 2005 Medical Record – Patient Release/Discharge Instructions); AR at 403 (20 October 2005 Chronological Record of Medical Care); AR at 390 (26 October 2005 Mental Status Evaluation); AR at 379 (3 January 2006 Mental Status Evaluation); and (3) the multiple non-compensable conditions plaintiff's prescriptions could treat other than PTSD and MDD, *see Fluoxine*, *supra*. Without direct evidence in the record of plaintiff's knowledge of the reason for his prescriptions, both sides request inferences regarding plaintiff's drug prescriptions. Considering the evidence presented on drug prescriptions alone, the Court finds under a preponderance of the evidence plaintiff did not know his prescription for fluoxine on 27 October 2005 was for PTSD with MDD, as he was at best confused and at worst fully unaware as to which diagnosis his prescriptions were intended to treat. *See Reynolds*, 846 F.2d at 748; *Chambers*, 417 F.3d at 1226.

       Third, the government contends the fact plaintiff sought treatment at a VA PTSD clinic 11 days after his discharge evidences his knowledge of PTSD with MDD at the time of discharge. Gov't's MTD at 8–9. Plaintiff, on the other hand, argues the VA records "clearly indicate that it was not until *after discharge* that Benitez was informed of his compensable mental-health diagnoses and their permanent nature." Pl.'s Resp. at 12 (citing AR at 460 (17 February 2006 VA Mental Health Treatment Plan)). As supporting evidence, plaintiff cites Mr. Benitez's records from a VA PTSD clinic, which he visited shortly after discharge from the Army. *Id.* The VA's post-examination documents noted the "[n]eed for psychoeducation to include [d]iagnosis, [p]rognosis, [t]reatments, [and] [s]ide effects." AR at 460 (17 February 2006 VA Mental Health Treatment Plan). Mr. Benitez's need for "psychoeducation," plaintiff claims, evidences his lack of knowledge about his retirement-eligible disability. Pl.'s Resp. at 12. Judge Dyk's dissent in *Chambers* fairly characterized the majority's opinion: "[I]f [a] service member acquires knowledge of his disability the day after discharge . . . the cause of action does not accrue until after a correction board has ruled." *Chambers*, 417 F.3d 1218, 1230 (Fed. Cir. 2005) (Dyk, J., dissenting). On this issue, although the government is not arguing Mr. Benitez's knowledge at the time he sought treatment at the VA clinic begins the statute of limitations, it is an argument not far removed. If evidence of plaintiff's knowledge directly after discharge could evidence knowledge at the time of discharge, the *Chambers* holding would be diminished. *See id.* at 1227 (majority op.) ("The appropriate inquiry under *Real*, therefore, is whether at the time of his separation . . . [the veteran] knew that he was entitled to disability retirement due to a permanent disability that was not a result of his intentional misconduct and was service-connected."); *id.* at 1230 (Dyk, J., dissenting). Mr. Benitez could theoretically have gained knowledge of his PTSD with MDD post-discharge but before visiting the clinic. In this case, however, the same is not true for evidence of plaintiff's *lack* of knowledge. There is significant evidence plaintiff learned the extent of his condition at the VA clinic (i.e., plaintiff learned of the diagnosis for the first time at the clinic). As plaintiffs note, the VA records indicate plaintiff was in need of "psychoeducation to include *Diagnosis*, Prognosis, Treatments, [and] Side effects." AR at 460 (17 February 2006 VA Mental Health Treatment Plan) (emphasis

---

form's illegibility and the parties' lack of arguments relying on the document, without additional evidence the Court finds this document is neutral in assessing plaintiff's knowledge of his injuries.

added).  Considering plaintiff was officially discharged for adjustment disorder rather than PTSD or MDD, the evidence weighs in favor of finding plaintiff needed "psychoeducation" to be aware of a compensable condition.  *See id.*  At oral argument the government argued:  "[Plaintiff] immediately went to a PTSD Clinic 11 days after his discharge.  Now, how did he know to do that if he had no idea until 2022 that he had PTSD?"  Tr. at 44:17–20.  The record shows some indication Mr. Benitez's visit to the VA clinic was not prompted by knowledge of his PTSD, however, as at least one medical record indicates "[Mr. Benitez] will be getting 5-17 discharge and has been given [the number] to VA rep to contact."  AR at 388 (27 October 2005 Chronological Record of Medical Care).  Additionally, the VA clinic indicated plaintiff attempted to join the Rhode Island National Guard but was rejected due to his mental health discharge.  AR at 461–62 (25 May 2006 VA Clinic Assessment).  The record therefore further provides at least some evidence plaintiff was unaware of the disqualifying nature of his condition.[4]  While not conclusive, plaintiff's VA records accordingly weigh in favor of finding plaintiff did not have knowledge of his PTSD with MDD.

Lastly, the Court collectively considers plaintiff's diagnoses, drug prescriptions, and VA records to determine whether plaintiff had sufficient knowledge of his unfitting condition under a preponderance of the evidence.  As indicated *supra*, the Army's documentation of plaintiff's diagnoses, though not necessarily conflicting, do not by themselves establish plaintiff lacked knowledge of his unfitting condition.  *See supra*.  Likewise, plaintiff's drug prescriptions do not establish, on their own, a lack of knowledge.  *See supra*.  When assessed in combination, the government argues for a significant number of assumptions and inferences:

- "I don't think there's a statement [where a doctor advised Mr. Benitez of his PTSD diagnosis], but . . . what did he think was happening?  I mean, you have to make . . . an assumption."  Tr. at 47:1–6.
- "I think [with] the presumption of regularity, you have to assume when he was diagnosed with those conditions, the medical provider in the ordinary course would explain to him . . . what their diagnosis is and why they're treating him with . . . heavy drugs."  Tr. at 52:5–10.
- "Why didn't he . . . make that claim in his declaration?  He didn't. . . . [H]e said I was having mental health appointments.  He was there.  He knew [what] was going on."  Tr. at 53:17–20.
- "There is no explicit statement in the record that says 'I told Mr. Benitez you have this condition,' but he was in the room with the medical provider who diagnosed him and ordered treatment for him.  It defies belief that medical providers would keep that a secret from the patient.  That's totally inconsistent with the presumption of regularity and common sense."  Tr. at 53:24–54:6.

---

[4] This fact also supports plaintiff's lack of knowledge of his right to DES processing.  *See infra* Section IV.C.  In discussing plaintiff's reenlistment attempt at oral argument, the government cited Judge Dyk's dissent in *Chambers*, characterizing it as criticizing the majority opinion for not permitting a court to "take into account information that . . . post-dated the date of discharge."  Tr. at 92:12–17.  Judge Dyk's dissent was primarily concerned with the implications of a "service member acquir[ing] knowledge of his disability the day after discharge" without triggering the statute of limitations.  *Chambers v. United States*, 417 F.3d 1218, 1230 (Fed. Cir. 2005) (Dyk, J., dissenting).  Here, the Court does not conclude plaintiff's knowledge after his discharge begins the statute of limitations; instead, the Court considers the plaintiff's absence of knowledge *after discharge* as a direct indication of his absence of knowledge *at the time of discharge*, just shortly before.

- "[I]t's not dispositive, but I think you can draw an inference, given the closeness in time, just 11 days after his discharge, that you can infer that he knew 11 days earlier." Tr. at 93:11–15.

The government argues for inferences in every category of evidence, including plaintiff's medical diagnoses, his drug prescriptions, and his VA visit. The combination of these numerous assumptions does more to counsel against plaintiff's knowledge than against it. Each of these assumptions do not overcome the evidence in the record supporting plaintiff's contention Mr. Benitez was, under a preponderance of the evidence, unaware his medically-noted PTSD diagnosis was anything more than adjustment disorder, which was diagnosed the day he was discharged from care following his suicide attempt. *See* AR at 407 (13 October 2005 Medical Record – Patient Release/Discharge Instructions) (diagnosing plaintiff with adjustment disorder). In combination, the evidence indicates plaintiff, under a preponderance standard, did not know his providers prescribed drugs for PTSD with MDD. The multiple inferences required to conclude plaintiff *did* have sufficient actual or constructive knowledge of his condition are outweighed by the evidence supporting Mr. Benitez was, under a preponderance standard, *unaware* of his PTSD with MDD. Plaintiff has therefore satisfied his burden of proof under a preponderance of the evidence he lacked sufficient actual or constructive knowledge of his injury to qualify for the *Real* exception. *Reynolds*, 846 F.2d at 748; *Chambers*, 417 F.3d at 1226; AR at 340 (17 January 2006 Chronological Record of Medical Care) (listing multiple mental health diagnoses before discharge); AR at 63 (1 January 2021 Decl. of Byron J. Benitez) (stating plaintiff was "prescribed medication, including Prozac, for depression and difficulty sleeping"); AR at 460 (17 February 2006 VA Mental Health Treatment Plan) (noting plaintiff's "[n]eed for psychoeducation to include [d]iagnosis, [p]rognosis, [t]reatments, [and] [s]ide effects"); *see also Colon v. United States*, 71 Fed. Cl. 473, 481–82 (2006) (finding insufficient evidence a plaintiff knew "that his mental condition was so severely disabling that it would have qualified him for disability retirement" despite having trouble sleeping and suffering from anxiety).

### C. Whether Mr. Benitez Had Sufficient Actual or Constructive Knowledge the Failure to Demand a Board Review Before Discharge Would Potentially Result in Losing Disability Benefits

Even if plaintiff was aware of his PTSD with MDD, plaintiff nevertheless alleges under a two-pronged *Real* inquiry plaintiff "was not aware that he had a right to DES processing and was given no opportunity to access it." Pl.'s Resp. at 16. In *Pohl*, the Federal Circuit characterized a potential second prong as whether plaintiff was "aware[] that the failure to demand a board review before discharge will result in potentially losing disability benefits." *Pohl*, 2023 WL 2982476, at *4. In *Real*, the panel "assume[d] that the service member ha[d] been informed that the failure to demand a board prior to discharge will result in his being ineligible for disability benefits from the service." *Real*, 906 F.2d at 1562 n.6. The Court accordingly turns to the evidence in the record to determine whether plaintiff has met his burden of establishing lack of actual or constructive knowledge "that the failure to demand a board review before discharge will result in potentially losing disability benefits." *See Reynolds*, 846 F.2d at 748; *Pohl*, 2023 WL 2982476, at *4; *Real*, 906 F.2d at 1562; *Chambers*, 417 F.3d at 1226.

Plaintiff contends he "never had an opportunity for review by an applicable board—the PEB—as required to initiate DES processing," and he was told he "did not have any right to administrative review." Pl.'s Resp. at 15 (emphasis omitted). When asked at oral argument, the government could not affirmatively say plaintiff knew about the distinction between an administrative discharge and a medical retirement and instead relied on plaintiff's representation by counsel. Tr. at 54:11–13 ("THE COURT: Is there any indication in the record that Mr. Benitez understood that distinction? [GOVERNMENT]: Well, he had a lawyer . . . ."). The government cited plaintiff's Notification of Separation, where plaintiff's defense counsel signed a statement reading: "Having been advised by me of the basis for his contemplated separation and its effects, the rights available to him, and the right to waive his rights, Specialist Byron J. Benitez personally made the choices indicated in the foregoing statement." AR at 309–10 (4 January 2006 Notification of Separation). The rights waived under this section, however, are not the same as those to DES processing. As plaintiff noted at oral argument, under Army Regulation 635-200, section 2-2 (Notice), a soldier's counsel for "administrative separation" is "separate [from] counsel under Department of Defense Instruction 1332-38 that provides for [DES] counsel." Tr. at 61:13–18. The version of Army Regulation 635-200, section 2-2(e)(2) in effect at the time of plaintiff's discharge states "consulting counsel will advise the soldier and will sign the written waiver as a witness." Army Reg. 635-200, § 2-2(e)(2) (2005). The waiver provision states:

> The soldier will be further advised of the following rights:
> (1) To consult with military counsel within a reasonable time (not less than 3 duty days). Soldiers may also consult with civilian counsel at their own expense.
> (2) To submit statements in his/her own behalf.
> (3) To obtain copies of documents that will be sent to the separation authority supporting the proposed separation. . . .
> (4) To a hearing before an administrative separation board under section III of this chapter if he/she had 6 or more years of total active and reserve service on the date of initiation of recommendation for separation. . . .
> (5) To waive the above rights in writing, including the right to submit a conditional waiver of the right to have the case heard before an administrative separation board.

*Id.* § 2-2(c). The waiver in the Notification of Separation accordingly corresponds, if at all, to an "administrative separation board," not to any rights to medical retirement. *Id.* § 2-2(c)(4); AR at 310 (4 January 2006 Notification of Separation). As the government acknowledges in its Reply Brief, the Army Regulations permit "Commanders . . . [to] approve [administrative] separation under this paragraph on the basis of other physical or mental conditions not amounting to disability." Gov't's MTD at 3 (quoting Army Reg. 635-200, § 5-17(a)). Plaintiff accordingly waived any right to an administrative separation board, not DES processing. Although the government contends plaintiff failure "to submit a statement" is equivalent to waiving his rights, Tr. at 96:1–7, there is nothing in the record to suggest counsel would have had a reason to advise plaintiff to "submit [a] statement[]" requesting DES processing. The government's argument is undermined by the Notification of Separation including Mr. Benitez's initials next to several provisions but next to the line "I (request) (waive) consideration of my case by an administrative separation board" is written "NA," i.e., "not applicable." AR at 309 (4 January 2006

Notification of Separation).  This "NA" demarcation indicates the inapplicability of an administrative separation board not the inapplicability of DES processing.[5]  Furthermore, unlike in *Pohl*, plaintiff was not presented with any documentation communicating or confirming plaintiff's knowledge of either process.  *See Pohl*, 2023 WL 2982476, at *5.  In *Pohl*, the panel noted:

> In June 1998, the Air Force doctor that evaluated Mr. Pohl noted that, if Mr. Pohl's primary care doctor recommended long term disability, Mr. Pohl would need to return for reevaluation by an MEB.  And shortly thereafter, the Air Force informed Mr. Pohl of his right to a PEB; referred to Department of Defense Directive 1332.18 (Separation or Retirement for Physical Disability) and Department of Defense Instruction 1332.38 (Physical Disability Evaluation); and warned him that a failure to elect to have his case reviewed by a PEB would "constitute a waiver of this right."

*Id.*  The Army did not undertake any of the above notification procedures in *Pohl*, including providing plaintiff a letter informing plaintiff of his rights.  *See* Tr. at 66:11 ("[GOVERNMENT:]  [T]here is no letter here in the record . . . .").  The government attributed the difference from *Pohl* to "the nature of the channel that was chosen for his separation . . . [and] a condition not amounting to a disability . . . [is] not typically an avenue where someone gets an MEB, because they don't have a disability."  Tr. at 66:10–16.  The government's arguments again require inferences which are outweighed by the evidence showing plaintiff, under a preponderance standard, was "[un]informed that the failure to demand a board prior to discharge will result in his being ineligible for disability benefits from the service."  *Real*, 906 F.2d at 1562 n.6; *Reynolds*, 846 F.2d at 748; *see Pohl*, 2023 WL 2982476, at *5 (discussing disability hearing notification procedures); AR at 309 (4 January 2006 Notification of Separation) (discussing only administrative separation procedures).

Plaintiff additionally notes an absence of plaintiff's signature on a medical record "which could have demonstrated knowledge of his condition at discharge."  Pl.'s Resp. at 7.  Specifically, the Army scheduled plaintiff for a pre-separation physical, which was conducted on 29 November 2005.  *See* AR at 160 (27 October 2005 Memorandum Requesting Chapter Physical); AR at 162–65 (29 November 2005 Report of Medical Examination); AR at 168–69 (29 November 2005 Report of Medical History) (noting "[s]eparation" as the "purpose of examination").  A report from plaintiff's appointment indicates the medical provider examined mostly physical, rather than mental conditions.[6]  *See* AR at 162 (29 November 2005 Report of

---

[5] Plaintiff attempts to argue the "NA" notation supports an inference "the Army affirmatively told Benitez that he had no right to any type of administrative review before any type of board in connection with his discharge."  Pl.'s Resp. at 8.  As indicated *supra*, however, the waiver only related to an administrative separation board.  Army Reg. 635-200, § 2-2(c)(4) (2005); AR at 310 (4 January 2006 Notification of Separation).  There is nothing in the record supporting an inference plaintiff believed this waiver applied to waiver of "any type of administrative review."

[6] Plaintiff's pre-separation exam was primarily physical rather than psychological despite plaintiff's 26 October 2005 Mental Status evaluation recommending expeditious discharge due to "continuous problems with adjustment."  AR at 151 (26 October 2005 Mental Status Evaluation).  At oral argument, the government could not explain the provider's failure to conduct a psychological exam.  Tr. at 68:19–69:7 ("THE COURT:  Well, the pre-separation physical does not have any mention of PTSD, correct?  [GOVERNMENT]:  That's right.  THE COURT:  Why not?  [GOVERNMENT]:  I cannot answer that based on the existing record, Your Honor.").

Medical Examination) (indicating at Box 40 "Psychiatric" was "not evaluated"); Tr. at 69:23–3 ("[THE COURT:] [Y]our point is that [the] evaluation is strictly physical? [GOVERNMENT:] It certainly appears that way. I mean, Box 75 is on the form, that is used to evaluated dozens of physical aspects of the human body. So I don't think we're talking about mental health here."). On the last page of the report, however, the "Physical Profile" provides an evaluation rating of "3" for plaintiff's psychiatric condition and each of plaintiff's other profile factors as "1."[7,8] AR at 165 (29 November 2005 Report of Medical Examination); *see* Army Reg. 40-501, § 7-13, tbl.7-1 (2005) (indicating a PULHES score increasing with severity from "1" to "4" for "[p]hysical capacity," "[u]pper extremities," "[l]ower extremities," [h]earing–ears," "[v]ision–eyes," and "[p]sychiatric"). Critically, despite this psychiatric diagnosis, Box 75 indicates "I have been advised of my disqualifying condition," yet the signature and date fields are blank. AR at 165 (29 November 2005 Report of Medical Examination). Though not dispositive of plaintiff's knowledge of his rights to DES processing, the absence of plaintiff's acknowledgement he was "advised of [his] disqualifying condition" is some evidence he lacked knowledge of the "disqualifying" nature of his condition and the medical retirement versus administrative separation process. *Id.*

Plaintiff lastly argues his attempt to re-enlist in the National Guard is evidence plaintiff was not using the administrative separation procedure to expeditiously depart the military without medical retirement.[9] Tr. at 64:1–4 ("[PLAINTIFF:] [H]e was devastated when he was discharged, and he immediately sought to re-enlist at the VA. So it is extremely unrealistic in this case to assume that's what he would want."). Although plaintiff's knowledge is assessed at the time of discharge, the VA records indicate plaintiff "did not realize that because he has a mental health discharge, he could no longer be in the military." AR at 184–85 (3 July 2006 VA Initial Evaluation for Post-Traumatic Stress Disorder). Plaintiff also stated "when he learned that

---

[7] The Army Regulations describe a rating of "3" as "[s]atisfactory remission from an acute psychotic or neurotic episode that permits utilization under specific conditions (assignment when outpatient psychiatric treatment is available or certain duties can be avoided)." Army Reg. 40-501, § 7-13, tbl.7-1. To the extent the government relies on plaintiff's providers informing him of his conditions, if the provider here discussed this psychiatric evaluation with Mr. Benitez—of which there is no evidence in the record—"satisfactory remission from an acute psychotic or neurotic episode" does not support an inference plaintiff was informed of permanent PTSD with MDD.

[8] Plaintiff contends "[b]ased on this score alone, Benitez should have been referred to [an MEB] . . . to determine whether this mental-health condition was compensable." Pl.'s Resp. at 7 (citing Army Reg. 40-501, § 7-13, tbl.7-1). At oral argument, however, plaintiff walked back this statement. Tr. at 67:10–23 ("[PLAINTIFF]: Your Honor, when there is sufficient evidence that a service member is unfit, such as was evidenced by that score, then, yes, the appropriate procedure would be to refer into the [DES] for further evaluation of that issue. THE COURT: But not based on the score alone, correct? [PLAINTIFF]: No, Your Honor, although here it was not just the score."). Although the Court considers the score in context to determine plaintiff's knowledge, as plaintiff admits a score of "3" does not automatically qualify a soldier for DES, *see supra* note 7 and accompanying text, and plaintiff is not making a claim for improper discharge, any alleged deviation from the required discharge standard has no weight at this stage of the case.

[9] The government notes, however, the military may have had an interest in expeditiously separating plaintiff rather than invoking DES procedures. Tr. at 56:25–57:5 ("THE COURT: And you agree, an administrative separation rather than a medical discharge is much simpler and faster? [GOVERNMENT]: Yes, indeed, much quicker, and I'm sure that's what the military had in mind when they did it, because they were concerned about the homicidal ideation."); *see also* Compl. at 22–23 ("Also on October 27, 2005, command requested that Benitez be administered a pre-separation physical. No one told Benitez the purpose of the physical. At this time, his brigade was preparing to deploy to Iraq. Clearly, command rushed his separation so that his position could be filled before his brigade deployed.").

he could never work for or serve in the military again, he became very depressed for several weeks and then decided that he should apply for Compensation and Pension from the VA." *Id.* at 185. Although, as the government noted at oral argument, plaintiff "couldn't re-enlist because the nature of his separation was for an adjustment disorder" and not "because of anything the VA said about his PTSD," Tr. at 92:5–8, the fact plaintiff did not realize he could not re-enlist is evidence of plaintiff's lack of knowledge about the discharge process in general—much less the difference between an administrative separation and medical retirement. This therefore only supports a conclusion plaintiff lacked knowledge of his right to DES processing. The Court does not fault the government for filing a motion to dismiss alleging plaintiff knew he had a compensable condition, but the record does not support this inference. The Court accordingly finds plaintiff has satisfied his "burden [to] establish[] subject matter jurisdiction by a preponderance of the evidence," *Reynolds*, 846 F.2d at 748, and, under a preponderance standard, Mr. Benitez was "[un]aware[] that the failure to demand a board review before discharge will result in potentially losing disability benefits." *Pohl*, 2023 WL 2982476, at *4; *Reynolds*, 846 F.2d at 748. As, under a preponderance standard, plaintiff lacked constructive and actual knowledge of the PTSD with MDD noted in his medical records and, under a preponderance standard, plaintiff was "[un]aware[] that the failure to demand a board review before discharge will result in potentially losing disability benefits," plaintiff's statute of limitations accordingly triggered on 12 September 2022 when the ABCMR denied plaintiff's petition for correction.[10] *Reynolds*, 846 F.2d at 748; *Pohl*, 2023 WL 2982476, at *4; *Real*, 906 F.2d at 1562; *Chambers*, 417 F.3d at 1226.

## V. Conclusion

For the foregoing reasons, the Court **DENIES** the government's Motion to Dismiss, ECF No. 10. At oral argument, the government suggested more than one potential next step should the Court deny the government's Motion to Dismiss.[11] The parties accordingly shall meet and

---

[10] As the *Real* exception likewise requires the injury not be "a result of [the veteran's] intentional misconduct and [be] service-connected," *Chambers v. United States*, 417 F.3d 1218, 1226 (Fed. Cir. 2005), plaintiff also argues he was not aware that his condition was not the result of misconduct, namely his abuse of prescription drugs in his suicide attempt. Pl.'s Resp. at 14–15; Tr. at 81:7–9 ("[PLAINTIFF:] [H]e believed—and, in fact, he was—punished for attempting suicide by being discharged as expeditiously as possible."). Plaintiff cites communication from Mr. Benitez's command on 11 October 2005 (following his suicide attempt) stating he may receive an other-than-honorable discharge "if this behavior continues under the provisions of 635-200 for a personality disorder (Chapter 5-13), entry level separation (Chapter 11), unsatisfactory performance (Chapter 13), or a pattern of misconduct (Chapter 14)." AR at 135 (Developmental Counseling Form). The Army eventually separated Mr. Benitez for adjustment disorder, however, and did not indicate any misconduct on its Recommendation for Separation. *See* AR at 180 (4 January 2006 Recommendation for Separation). Plaintiff's 13 October 2005 discharge instructions and subsequent follow-up records do not provide any indication plaintiff thought his discharge was a result of any misconduct, including "abuse [of] a prescription," Tr. at 78:20. In addition, plaintiff argues Mr. Benitez's injury was not aware his PTSD with MDD was service connected, as "[not every] in-service injury is service connected," including those for plaintiff's misconduct, such as "[i]f you're a drug user." Tr. at 77:16–24. For analogous reasons, plaintiff has not "come forward with evidence establishing the court's jurisdiction . . . by a preponderance of the evidence," as the evidence in the record does not support finding plaintiff believed his condition was the result of his misconduct. *See Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988) (citing *Zunamon v. Brown*, 418 F.2d 883, 886 (8th Cir. 1969)).

[11] Tr. at 85:21–25 ("THE COURT: Well, if the Court denies the government's motion to dismiss, then the next step is MJAR briefing? [GOVERNMENT]: Your Honor, either that or the Government may file a motion for voluntary remand . . . .").

- 19 -

confer and **SHALL FILE** a joint status report **on or before 5 June 2024** suggesting next steps in this case.

      **IT IS SO ORDERED.**

<u>s/ Ryan T. Holte</u>
RYAN T. HOLTE
Judge
